**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**GABINO RAMOS HERNANDEZ**                                              **PLAINTIFF**

**v.**                                              **CIVIL ACTION NO. 2:17-cv-123-TBM-MTP**

**PHILLIP CAUSEY *and* THE
UNITED STATES OF AMERICA**                                              **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

On July 20, 2016, Gabino Ramos Hernandez was unarmed when he was shot in his right forearm by Immigration and Customs Enforcement ("ICE") Officer Phillip Causey. Pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), Hernandez asserts that Causey violated his Fourth, Fifth, and Fourteenth Amendment rights to be free from an unreasonable and excessive use of deadly force. Causey filed a Motion for Summary Judgment based on qualified immunity. Because the Court finds that a genuine issue of material fact exists as to the location of Hernandez's hands at the time of the shooting, Causey's Motion for Summary Judgment based on qualified immunity is denied. In the light most favorable to Hernandez, a jury could conclude that Hernandez was shot while he was standing with his hands raised in the air.

In his Complaint, Hernandez also asserts three separate causes of action against the United States pursuant to the Federal Tort Claims Act: 1) wrongful use of deadly force; 2) wrongful assault and battery; and 3) negligent training and supervision. In response, the Government filed a Partial Motion to Dismiss only the negligent training and supervision claim since discovery related to the intentional tort claims is ongoing. In its Motion, the Government asserts that the "discretionary function exception" of the Federal Tort Claims Act prevents negligent training and supervision suits

against it. As such, the Government submits that Hernandez's negligence claim must be dismissed for lack of subject matter jurisdiction. The Court finds that Hernandez has failed to satisfy the minimum pleading requirements to withstand dismissal under the discretionary function exception, and the negligent training and supervision claim is dismissed without prejudice under Rule 12(b)(1).

## I. FACTUAL BACKGROUND

On July 20, 2016, Hernandez was driving home in Laurel, Mississippi. His brother was following behind him in another vehicle. Hernandez's brother allegedly rolled through a stop sign. Laurel Police Department Officer David Driskell initiated his blue lights. [68-1], ¶ 2. Hernandez's brother did not immediately pull over. [68-1], ¶ 2. Officer Driskell followed the brother's vehicle until he pulled into a driveway on 13th Avenue. [68-1], ¶ 2. After pulling into the driveway, Officer Driskell got out of his patrol car. [68-1], ¶ 2. Hernandez's brother got out of his vehicle and appeared intoxicated. [68-1], ¶ 3. Officer Driskell attempted to question Hernandez's brother in English, but discovered that his primary language was Spanish. [68-1], ¶ 3. While Officer Driskell was able to obtain basic information from Hernandez's brother in English, the language barrier made it difficult to continue the questioning. [68-1], ¶ 3.

Officer Driskell knew that ICE agents were in the area performing immigration operations.[1] [68-1], ¶ 3. He called ICE Deportation Officer Mike McGhee and requested translation assistance. [68-1], ¶ 3. ICE Officer McGhee then called fellow ICE Deportation Officers Phillip Causey and Kyle Le, who were assigned to the transportation van. It is clear from the record that the ICE Officers were only told that the transportation van might be needed for deportation purposes at the address where Hernandez was located. [75-1], pgs. 17:20-19:01; [68-3], ¶ 2; *see also* [68-4], ¶ 2.

---

[1] Driskell testified that, earlier that evening, he stopped a Hispanic individual and had reason to believe the individual was affiliated with the MS-13 gang. [75-3], pgs. 27:18-32:3. As a result, he called ICE Officer Mike McGhee.

After calling ICE Officer McGhee, Officer Driskell radioed a fellow Laurel Police Department Officer and requested a breathalyzer. [75-8] at 3:59; [68-2], ¶ 2. At this point, Officer Driskell had not yet spoken to Hernandez. [75-3], pg. 103:5-14.

After handcuffing Hernandez's brother, Police Officer Driskell then addressed Hernandez, who had exited his vehicle. [75-8] at 4:50-5:07. Hernandez asked Officer Driskell, "what's the problem?" [75-8] at 5:08-5:10. Officer Driskell responded, "he's drunk." [75-8] at 5:10-5:15. Hernandez and Officer Driskell continued to converse, and Hernandez explained that the driver was his brother. *Id*. Officer Driskell stated that someone was on the way who could speak Spanish, and that they could continue their conversation once that person arrived. [75-8] at 5:15-5:41. It is clear from the record that Officer Driskell never indicated that Hernandez was getting a ticket for a traffic offense or that he was being detained. [75-3], pg. 81:13-23; [75-8] at 0:00-16:28. Instead, Officer Driskell merely pointed to Hernandez's vehicle with his flashlight and told Hernandez, "hang tight right there, okay." [75-8] at 5:39-5:41. Officer Driskell gave this instruction because he was the lone officer on scene and was waiting on backup. [75-3], pg. 75:25-76:01.

Officer Driskell then returned to his patrol car where Hernandez's brother was standing handcuffed. [75-8] at 5:41-6:10. Hernandez began to walk towards Officer Driskell and his brother. After Officer Driskell told him to "wait right there," Hernandez stopped walking. [75-8] at 6:10-6:14. Hernandez then explained, from a distance, that he had someone who could translate on the phone. [75-8] at 6:28-6:33. Officer Driskell responded that he had a police officer on the way who would translate. [75-8] at 6:50-6:55. Hernandez continued to talk on the phone and walked back and forth in the driveway for the next few minutes. [75-8] at 6:28-11:30.

Before the ICE officers arrived, Laurel Police Department Officer Wade Robertson brought a breathalyzer. [75-8] at 11:30. Officer Driskell told Officer Robertson, referencing Hernandez, "that

3

one over there is kind of mouthy. I don't know what he's saying, but we're going to find out in just a minute." [75-8] at 11:30-11:38. Officer Driskell then administered the breathalyzer to Hernandez's brother and began to write him a citation. [75-8] at 11:44-14:00. After completing a few sections on the citation form, Officer Driskell called the ICE officers again to tell them that another guy on scene was "real mouthy," and that he "couldn't understand a word he's saying." [75-8] at 14:24-14:40.

Once ICE Officer Mike McGhee arrived, Police Officer Driskell left Hernandez's brother with ICE Officer McGhee, and he went to talk to Hernandez. [68-1], ¶ 4. Officer Driskell walked toward the house and called out to Hernandez, who was no longer standing in the driveway. [75-8] at 15:34-15:38. At that time, Hernandez was in the garage talking on the phone to a friend about what was going to happen to his brother. [75-22] at 42:3-10. Then, Hernandez saw the ICE van and ran. [75-22] at 42:10-14.

Officer Driskell realized that Hernandez was running and said, "he's darted around the front . . . I think he just ran around the front." [75-8] at 15:58-16:02. A few seconds later, Officer Driskell said, "he's going down the block, he's going down the block! He's running fast! He's running fast!" [75-8] at 16:16-16:21. Police Officer Robertson then asked Police Officer Driskell, "do you want me to go get him?" to which Officer Driskell responded, "yeah." [75-8] at 16:26-16:28

Hernandez was already running when the Defendant, ICE Officer Phillip Causey, and ICE Officer Kyle Le arrived on the scene in the ICE transportation van. [68-3], ¶ 2; [68-4], ¶ 2. ICE Officer McGhee told ICE Officers Causey and Le to "walk back down to the end of the street and see if you can locate him." [75-1], pg. 23:12-19. Significantly, Causey and Le were given no further instructions. It is clear from the record that the ICE Officers were only called to assist with translation services for Hernandez's brother and were not told that Hernandez was suspected of committing any crime. [75-1], pg. 45:23-25. Causey was not told that Hernandez was armed or dangerous. [75-1], pg. 45:10-22.

4

ICE Officers Causey and Le headed to an intersection to see if they could locate Hernandez. Upon entering the intersection, they saw Hernandez approximately fifty to sixty yards away at the end of the street. [68-4], ¶ 3; [75-1], pg. 25:1-3. As Hernandez approached Causey and Le, the ICE officers began shouting. [75-8] at 16:42-16:55. Causey gave Hernandez commands in English and Spanish to stop, put his hands up, and get down. [68-3], ¶ 3; [75-1], pg. 25:6-19. Le stated that he used hand gestures to try to get Hernandez to stop. [68-4], ¶ 3. Hernandez continued to walk towards Causey and Le. [68-3], ¶ 3; [75-1], pg. 25:6-19; [68-4], ¶ 3. Le testified that he did not see anything in Hernandez's hands while he was walking towards them. [75-2], pg. 12:8-23. It is undisputed that Hernandez came to a stop when he was approximately twelve to fifteen feet from Causey, at which point Causey shot him. [68-3], ¶ 3; [75-1], pgs. 25:19-26:6.

Hernandez testified that, at the time he was shot, his hands were raised. [75-22], pg. 75:13-19. Specifically, Hernandez testified that his hands were near his waist, and while his hands were not raised very high, his palms were facing Causey. [75-22], pg. 75:18-22. Officer Driskell stated in an interview after the shooting that he saw Hernandez with his hands near his waist. [83-2], at 10:20-10:28. In that same interview, Officer Driskell stated that Officer Robertson told him that he saw Hernandez with his hands raised. [83-2], at 10:20-10:28; [75-3], pg. 43:14-24.

According to Causey, once Hernandez was approximately twelve to fifteen feet away, Hernandez stopped and reached into his pocket. [68-3], ¶ 3; [75-1], pgs. 25:19-26:6; 35:21-25. Causey testified that once Hernandez reached into his pocket, Causey discharged his firearm. [68-3], ¶ 3; [75-1], pg. 26:1-6. Although the shot struck Hernandez in his right forearm, Causey testified that he was shooting to kill. [75-1], pg. 28:13-18. Causey, Le, and Robertson testified that Hernandez reached towards his pocket before the shooting. Hearing Transcript 5:22-24; [68-4], ¶ 3; [75-1], pgs. 35:24-36:5; [75-2], pg. 33:3-8; [75-4], pg. 24:16-20; [68-2], ¶ 4. Hernandez's biomechanical expert opined

5

that when Hernandez was shot, his right hand was not "reaching into his right side pocket as claimed by Causey. Hernandez' diagnosed proximal radius injury and point of entry are consistent with his right forearm positioned forward of his body." [75-16].

## II. PROCEDURAL HISTORY

Hernandez filed suit in this Court on July 20, 2017 against ICE Officer Phillip Causey alleging *Bivens* claims arising out of the shooting on July 20, 2016. Hernandez later amended his Complaint to allege negligence and intentional tort claims against the United States under the Federal Tort Claims Act.

On August 31, 2018, the Court stayed the case because Causey was deployed overseas on active military duty. After Causey completed his deployment, the Defendants filed a combined Partial Motion to Dismiss [68] for lack of subject matter jurisdiction as to the negligent training and supervision claim under the Federal Tort Claims Act and a Motion for Summary Judgment [68] based on qualified immunity. Causey also filed a Motion to Strike [81] nine of Hernandez's exhibits offered in support of his Response in Opposition to Causey's Motion for Summary Judgment.

## III. THE UNITED STATES' MOTION TO DISMISS

The United States argues that the negligent training and supervision claim asserted against it must be dismissed for lack of subject matter jurisdiction because the Federal Tort Claims Act prevents such suits under the "discretionary function exception." In his response, Hernandez argues that his negligent training and supervision claim is not barred by the discretionary function exception because government officials have no discretion to violate the Constitution. More specifically, Hernandez states that "Causey's supervisors allowed him and the other ICE agents on the ERO [Enforcement and Removal Operations] team that night to enter into a collaboration with at least one local police

officer to circumvent constitutional prohibitions on ICE agents stopping and questioning someone solely on the basis of race." [75], pg. 40.

### A. Standard of Review

"Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject matter jurisdiction of the district court to hear a case." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). A court may find lack of subject matter jurisdiction "on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996) (internal citations omitted). "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Wells v. Ali*, 304 Fed. App'x 292, 293 (5th Cir. 2008) (citing *Fernandez–Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993)). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming*, 281 F.3d at 161.

### B. The Discretionary Function Exception of the Federal Tort Claims Act ("FTCA")

"Sovereign immunity protects the federal government from being sued without its consent." *Doe v. United States*, 831 F.3d 309, 319 (5th Cir. 2016) (citing *Molzof v. United States*, 502 U.S. 301, 304-5, 112 S. Ct. 711, 116 L. Ed. 2d 731 (1992)). It is well established that Congress has waived the sovereign immunity of the United States by giving district courts jurisdiction over certain torts committed by government employees. 28 U.S.C. § 1346(b). "The discretionary function exception is one of several limitations on the FTCA's waiver." *Tsolmon v. United States*, 841 F.3d 378, 382 (5th Cir. 2016). The exception provides that the United States is not liable for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on

the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Courts employ a two-part test in determining whether the discretionary function exception applies: (1) "the conduct must be a 'matter of choice for the acting employee;'" and (2) "the judgment [must be] of the kind that the discretionary function exception was designed to shield.'" *Tsolmon*, 841 F.3d at 382 (citations omitted); *United States v. Gaubert*, 499 U.S. 315, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991). If a case falls within this statutory exception to the FTCA, the court lacks subject matter jurisdiction. *Campos v. United States*, 888 F.3d 724, 730 (5th Cir. 2018).

The discretionary function exception is designed to continue immunity for policy-oriented choices. *St. Tammany Par., ex rel. Davis v. Fed. Emergency Mgmt. Agency*, 556 F.3d 307, 325–26 (5th Cir. 2009). Indeed, "[i]f a statute, regulation, or policy leaves it to a federal agency to determine when and how to take action, the agency is not bound to act in a particular manner and the exercise of its authority is discretionary." *Gibson v. United States*, 809 F.3d 807, 812 (5th Cir. 2016) (quoting *Spotts v. United States*, 613 F.3d 559, 567 (5th Cir. 2010)). On the other hand, the violation of a mandatory "federal statute, regulation, or policy" — that specifically prescribes a course of conduct — is not the type of public policy consideration that is ordinarily shielded. *Gibson*, 809 F.3d at 812.

### C. Hernandez's Negligent Training and Supervision Claim is Dismissed without Prejudice

Hernandez asserts that the discretionary function exception does not apply to his negligent training and supervision claim because government officials have no discretion to violate the Constitution. [75], pg. 34. Hernandez's factual allegation is that Laurel Police Officer Driskell's request for translation services was "an apparent pretext" to allow ICE officers to question any Hispanic person that Officer Driskell stopped, simply because of race. *See* [75], pgs. 2, 3, 4, 7, 33, 40.

8

In reply, the Government claims that Hernandez's allegations are based on supposition, and that Hernandez's facts "are not supported by the record." [83], pg. 3. The Government does not address why several ICE officers were called for translation assistance related to a drunk driving stop, and the Government does not dispute that ICE detained an individual earlier in the day after Laurel police officers requested ICE involvement. Nor does the Government explain why the ICE detention van was needed for translation assistance. It is unclear if the Government is conceding these facts and arguing as a matter of law there is no constitutional violation, or simply asserting that the United States has immunity under the FTCA for any alleged constitutional violations. Regardless, Hernandez's claim should be dismissed without prejudice because Hernandez has not properly pled a constitutional violation.

Hernandez wholly fails to plead, within any of the various Complaints filed, that the Constitution was violated with respect to the negligent training and supervision claim. *See* [1]; [5]; [20], ¶ XXXVII-XXXIX. In his response brief, he does not even attempt to identify which portion of the Constitution has allegedly been violated. *See* [75], pgs. 34, 41, 42. While the Court may have a suspicion as to the specific constitutional provision(s) that Hernandez may think he has raised, the Court is not going to engage in speculation. Moreover, Hernandez fails to point to a single case that supports a Constitutional violation for this type of negligent training and supervision claim. Furthermore, Hernandez does not dispute that the supervision and training of Causey is the kind of conduct that the discretionary function exception is designed to shield. *See* [75], pg. 34.

Without more, Hernandez has not met his 12(b)(1) "burden of showing an unequivocal waiver of sovereign immunity." *Linke v. United States*, No. W-14-cv-444, 2015 WL 12743611, at *5 (W.D. Tex. Mar. 31, 2015) (citing *Spotts*, 613 F.3d at 568). Since Hernandez has failed to satisfy the minimum pleading requirements to withstand dismissal under the discretionary function exception, his

negligent training and supervision claim is dismissed without prejudice under Rule 12(b)(1). *See Hart v. Bayer Corp.*, 199 F.3d 239, 248 (5th Cir. 2000) (explaining that "a plaintiff's failure to meet the specific pleading requirements should not automatically . . . result in dismissal of the complaint with prejudice to re-filing.").

Despite not meeting his burden under Rule 12(b)(1), the Fifth Circuit has stated that district courts should "afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.2d 305, 329 (5th Cir. 2002). If Hernandez chooses to amend his Complaint, he must identify which portion of the Constitution has allegedly been violated and allege a proper constitutional violation. Like the Fifth Circuit in *Doe*, this Court need not determine at this time whether an alleged constitutional violation (as opposed to a statutory, regulatory, or policy violation) precludes the application of the discretionary function exception. *Doe v. United States*, 831 F.3d 309, 319 (5th Cir. 2016).[2]

---

[2] Whether a constitutional violation (as opposed to a statutory, regulatory, or policy violation) precludes the application of the discretionary function exception has been an area of disagreement over the years. *See Doe v. United States*, 831 F.3d 309, 319-20 (5th Cir. 2016) (finding that because the plaintiff failed to plead a proper constitutional violation, the question is not before the court); *see also Lopez v. U.S. Immigr. & Customs Enf't*, 455 F. App'x 427 (5th Cir. 2011) (avoiding the issue); *Castro v. United States*, 560 F.3d 381 (5th Cir. 2009) (*Castro I*); *Castro v. United States*, 608 F.3d 266 (5th Cir. 2010) (*Castro II*) (en banc); *Loumiet v. United States*, 828 F.3d 935, 939 (D.C. Cir. 2016) (collecting cases and finding that "the discretionary-function exception does not categorically bar FTCA tort claims where the challenged exercise of discretion allegedly exceeded the government's constitutional authority to act."); *but see Linder v. United States*, 937 F.3d 1087, 1090 (7th Cir. 2019), *cert. denied,* 141 S. Ct. 159, 207 L. Ed. 2d 1097 (2020) (finding the "theme that 'no one has discretion to violate the Constitution' has nothing to do with the Federal Tort Claims Act, which does not apply to Constitutional violations . . . The limited coverage of the FTCA, and its inapplicability to constitutional torts, is why the Supreme Court created the *Bivens* remedy against individual federal employees."); *Ramirez v. Reddish*, No. 2:18-cv-176-DME, 2020 WL 1955366, at *28 (D. Utah Apr. 23, 2020) (declining "without explicit congressional, Supreme Court, or Tenth Circuit direction, to superimpose such an involved and detailed analysis of the constitutionality of the federal employee's conduct challenged under the FTCA into the otherwise straightforward inquiry that § 2680(a) and the Supreme Court have prescribed[.]"); DANIEL A. MORRIS, FED. TORT CLAIMS § 2:34 (2020) (collecting cases and noting that "[f]ederal constitutional torts are not separate grounds for liability under the Federal Tort Claims Act").

## IV. CAUSEY'S MOTION FOR SUMMARY JUDGMENT

In his Motion for Summary Judgment based on qualified immunity, Causey argues there is no evidence that he violated a clearly established right when he discharged his weapon because Hernandez's hand was in his pocket. In response, Hernandez argues that the shooting of an unarmed person with his hands raised is a violation of a clearly established constitutional right.

### A. Standard of Review

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enterprises, Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The substantive law identifies which facts are material. *Anderson*, 477 U.S. at 248.

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The nonmoving party must then "go beyond the pleadings" and "set forth 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (citation omitted).

Notably, the normal "summary judgment burden of proof is altered in the case of a qualified immunity defense." *Wolfe v. Meziere*, 566 F. App'x 353, 354 (5th Cir. 2014) (citing *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005); *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489

(5th Cir. 2001)). Indeed, the burden shifts to the plaintiff to show that the defense is not available. *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016) (quoting *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016)). A plaintiff "must rebut the defense by establishing that the officer's allegedly wrongful conduct violated clearly established law." *Wolfe*, 566 F. App'x at 354 (citing *Michalik*, 422 F.3d at 262; *Bazan ex rel. Bazan*, 246 F.3d at 489). Hernandez "cannot rest on conclusory allegations and assertions but must demonstrate genuine issues of material fact regarding the reasonableness of the officer's conduct." *Id.* "Further, although courts view evidence in the light most favorable to the nonmoving party, they give greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Valderas v. City of Lubbock*, 937 F.3d 384, 388 (5th Cir. 2019) (citations omitted).

### B. *Bivens* question

Before turning to the qualified immunity analysis, the Court must first address "the *Bivens* question" because the Supreme Court has held that it is "antecedent" to the question of qualified immunity. *Hernandez v. Mesa (Hernandez I)*, ––– U.S. ––––, 137 S. Ct. 2003, 2006, 198 L. Ed. 2d 625 (2017). In *Bivens*, the Supreme Court recognized an implied right of action for damages against federal officers who are alleged to have violated a citizen's constitutional rights. *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971). And in *Zilgar v. Abbasi*, the Supreme Court acknowledged the "fixed principle" that plaintiffs may bring *Bivens* suits against federal law enforcement officers for "seizure[s] that violate the Fourth Amendment." *Zilgar v. Abbasi*, ––– U.S. ––––, 137 S. Ct. 1843, 1877, 198 L. Ed. 2d 290 (2017). "Using lethal force against a person who 'poses no immediate threat to the officer and no threat to others' surely qualifies as an unreasonable seizure." *Hernandez v. Mesa*, ––– U.S. ––––, 140 S. Ct. 735, 758, 206 L. Ed. 2d 29 (2020) (*Ginsburg, J. dissenting*) (where the majority opinion declined to extend *Bivens* to

the context of a cross-border shooting but the Government did not dispute the shooting of an unarmed individual on American soil is not a new context) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)).

Here, Hernandez alleges in his Complaint that he was unarmed and had his hands raised at the time of the shooting. Further, it is undisputed by the parties that the *Bivens* claim asserted against Causey does not extend the *Bivens* remedy into a "new context," which is a disfavored judicial activity. *Ziglar*, 137 S. Ct. at 1857. In fact, while Hernandez briefed this issue, Causey provided no analysis on the *Bivens* question and made no objection as to whether Hernandez could bring suit under the *Bivens* framework for a Fourth Amendment excessive force claim.

The Court finds Hernandez's *Bivens* claims against Causey to be the kind of Fourth Amendment search-and-seizure case that courts have long adjudicated through *Bivens* actions.[3] Accordingly, the Court turns now to the qualified immunity analysis.

### B. Qualified immunity analysis

Causey claims he is entitled to qualified immunity on the *Bivens* claim against him. Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. 511

---

[3] *Martinez-Aguero v. Gonzalez*, 459 F.3d 618 (5th Cir. 2006) (holding that plaintiff may bring a *Bivens* claim for unlawful arrest and the excessive use of force under the Fourth Amendment); *Del Paz v. Coy*, 86 F.3d 367 (5th Cir. 2015) (recognizing that *Bivens* extends to claims arising from excessive force by federal law enforcement officers); *Samtani v. City of Laredo*, 274 F. Supp. 3d 695, 702 (S.D. Tex. Aug. 16, 2017) (finding that the plaintiff "has stated *Bivens* claims against the six CBP officers for use of excessive force in violation of the Fourth Amendment."); *Gray v. Thompson*, No. 3:01-cv-1190-M, 2002 WL 1544867 (N.D. Tex. July 10, 2002) (finding the plaintiff's allegations asserted an excessive force claim under *Bivens*); *Jacobs v. Alam*, 915 F.3d 1028 (6th Cir. 2019) (finding that the use of deadly force by federal law enforcement officers is properly considered under *Bivens*).

Courts use a two-prong analysis to determine whether a defendant is entitled to qualified immunity.[4] The Court must decide, in the light most favorable to Hernandez, 1) whether Hernandez has alleged a violation of a constitutional right and 2) whether the right was clearly established. *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017) (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)). Courts have discretion to address either prong of the qualified immunity inquiry first. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). "[U]nder either prong, [the Court] may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Winzer v. Kaufman County*, 916 F.3d 464 (5th Cir. 2019) (citing *Tolan v. Cotton*, 572 U.S. 650, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014)). The Court "must view the evidence in the light most favorable to the opposing party." *Tolan*, 134 S. Ct. at 1866 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)).

"To overcome a claim of qualified immunity in an excessive force case, the plaintiff must show (1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Valderas*, 937 F.3d at 389 (internal quotations omitted) (citations omitted). As discussed above, the Court must view the evidence in the light most favorable to Hernandez, and draw all reasonable inferences in his favor that are supported by the summary judgment record. *Scott v. Harris*, 550 U.S. 372, 381 n.8, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (noting that after the court has "drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the reasonableness of a police officer's actions "is a pure

---

[4] A *Bivens* action mirrors a civil rights action brought under 42 U.S.C. § 1983, the difference being that a *Bivens* action applies to alleged constitutional violations by federal actors, while a Section 1983 action applies to alleged constitutional violations by state actors. *Izen v. Catalina*, 398 F.3d 363, 367 n. 3 (5th Cir. 2005). "The same analysis applies to excessive force claims brought against federal law enforcement and correctional officers under *Bivens*" as those brought under Section 1983. *Graham v. Connor*, 490 U.S. 386, n. 9, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989); *Rodriguez v. Ritchey*, 539 F.2d 394, 399 (5th Cir. 1976) ("[F]or the most part, courts have applied § 1983 law to *Bivens* cases."); *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015) ("The court reviews *Bivens* claims under the same legal principles as Section 1983 actions, except for the requirement of federal actions under *Bivens* and state action under Section 1983.").

question of law."). Here, it is undisputed that Hernandez suffered more than a *de minimis* injury. Accordingly, the question is whether the use of force was clearly excessive or unreasonable.

### 1. Hernandez has alleged a violation of his Fourth Amendment constitutional right

The constitutional right at issue here is the Fourth Amendment right of every person to be free from "unreasonable" seizures. U.S. CONST. amend. IV. The use of deadly force violates the Fourth Amendment unless "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee*, 471 U.S. at 3. Where a plaintiff complains of excessive force during an arrest, investigatory stop, or other seizure, the claim must be analyzed under the Fourth Amendment's objective reasonableness standard, not under a substantive due process standard. *Graham*, 490 U.S. at 394.

The ultimate issue in analyzing an excessive force claim under the Fourth Amendment is whether, from the officer's perspective, the use of force was objectively reasonable under the circumstances. *Id.* at 396–97. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Accordingly, the Court may only consider facts that were "knowable" to Causey at the time of the shooting. *White v. Pauly*, 137 U.S. 548, 137 S. Ct. 548, 550, 196 L. Ed. 2d 463 (2017).

The proper application of the objective reasonableness standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 394. Here, it is undisputed that Hernandez was not under arrest at the time of the shooting. In fact, Causey was never told that Hernandez had committed any crime, that he was escaping, nor that Hernandez was

armed or dangerous. [75-1], pg. 45:23-25; 45:10-22. Upon Causey's arrival on scene, he was only told to "walk back down to the end of the street and see if you can locate him." [75-1], pg. 23:12-19.

The Fifth Circuit has held that the excessive force inquiry is confined to whether the officer "was in danger at the moment of the threat that resulted in the [officer's] shooting [of the victim]." *Bazan ex rel. Bazan*, 246 F.3d at 493. "So, the focus of the inquiry should be on 'the act that led [the officer] to discharge his weapon[.]" *Amador v. Vasquez*, 961 F.3d 721, 728 (5th Cir. 2020) (quoting *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009)).

The determining factor in this case concerns where Hernandez's hands were positioned at the time of the shooting, which is heavily disputed. Hernandez asserts that Causey's commands were confusing and that at the time of the shooting, his hands were near his waist, raised, with his palms facing Causey. According to Causey, however, Hernandez continually disobeyed his commands to put his hands up and to get on the ground. Causey asserts that once Hernandez was approximately twelve to fifteen feet away, Hernandez stopped and reached his hand into his pocket. Causey testified that once Hernandez reached into his pocket, Causey shot Hernandez in the right forearm.

Causey argues that the body camera footage and audio from the incident contradict Hernandez's version of events. The Court has reviewed the body camera footage and notes that it is impossible to determine where Hernandez's hands were located at the time of the shooting. Accordingly, the video evidence does not "utterly discredit" Hernandez's version of events. *Scott*, 550 U.S. at 380; *Amador*, 961 F.3d at 728.[5] In addition to Hernandez's testimony, Police Officer

---

[5] The video evidence includes the body camera footage from Officer Driskell and Officer Robertson. Neither body camera video depicts the shooting itself, as Officer Driskell observed the shooting from a distance and Officer Robertson jumped into a ditch seconds before the shooting. In addition to showing some of the events leading up to the shooting, the video depicts the moments immediately after the shooting when Hernandez is lying on the ground and Causey shouts, "you shouldn't have put your hand in your f****** pocket!" Hernandez's response is not understandable for the most part, but he does tell Causey that he does not speak English. [75-10], at 18:00-18:13. Causey alleges that this interaction demonstrates that Causey is more credible than Hernandez, but this argument lacks merit. Credibility determinations are for a jury.

Driskell stated that he saw Hernandez with his hands near his waist and that, after the shooting, Police Officer Robertson told him that he saw Hernandez with his hands raised. [83-2], at 10:20-10:28. Finally, Hernandez's biomechanical expert, Mr. Arslanoglu, opined that when Hernandez was shot, his right hand was not "reaching into his right side pocket as claimed by Causey. Hernandez' diagnosed proximal radius injury and point of entry are consistent with his right forearm positioned forward of his body."[6] [75-16]. Under the summary judgment standard, the Court must accept as true that Hernandez's hands, while not high, were raised with his palms facing Causey at the time of the shooting. *See Winzer*, 916 F.3d at 474 (citing *Tolan*, 572 U.S. at 656–57); *Graham*, 490 U.S. at 396.

Accepting as true that Hernandez's hands were raised with his palms facing Causey at the time of the shooting, there is a material factual dispute to resolve as to whether Causey reasonably believed that Hernandez posed a threat of serious harm at the time of the shooting. *Amador*, 961 F.3d at 728. After considering the totality of the circumstances and construing the evidence in the light most favorable to Hernandez, a jury could conclude that Hernandez's hands were raised at the time of the shooting, and that Causey's use of force was unreasonable. *Id*. at 728-29 (finding genuine issues of material fact as to reasonableness of excessive force when officers shot the plaintiff when he was standing motionless thirty feet away from the officers with his hands in the air); *Cullum v. Siemens*, No. SA-12-cv-49-DAE, 2013 WL 5781203, at *9–10 (W.D. Tex. Oct. 25, 2013) (finding deadly force was unreasonable because the armed suspect's hand was "palm-up in a 'stop' gesture" that was "submissive" and he did not present an immediate threat); *Jamison v. Metz*, 541 F. App'x. 15, 19–20 (2nd Cir. 2013) (holding that officers were not entitled to qualified immunity where the suspect had stopped and was in an act of surrendering by putting his hand in the air); *Robinson v. Nolte*, 77 F.

---

[6] In his Motion to Strike, Causey objects to the admissibility of the biomechanical expert's opinion. For the reasons discussed below, his objection is overruled.

App'x. 413, 414 (9th Cir. 2003) (holding that the use of deadly force violated the suspect's Fourth Amendment rights where the suspect had "his arms raised over his head in a classic surrender position, with a gun in his lap"). Accordingly, the Court finds that Hernandez has alleged a violation of a constitutional right and turns to the second prong of the qualified immunity analysis.

### 2. Hernandez's Fourth Amendment right was "clearly established" at the time of the shooting

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11-12, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012)). "[T]he salient question . . . is whether the state of the law in [2016] gave [Causey] fair warning that [his] alleged treatment of [Hernandez] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002). "In the excessive force context, a constitutional violation is clearly established if no reasonable officer could believe the act was lawful." *Darden v. City of Forth Worth, Texas*, 880 F.3d 722, 727 (5th Cir. 2018). It is well established that under the Fourth Amendment, "it is unreasonable for an officer to 'seize an unarmed, nondangerous suspect by shooting him dead.'" *Brosseau v. Haugen*, 543 U.S. 194, 197, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (quoting *Tennessee*, 471 U.S. at 11). Causey testified that when he discharged his firearm, he was not firing a warning shot. [75-1], pg. 28:13-18. He was shooting to kill. [75-1], pg. 28:13-18.

The law is clear. Every reasonable officer would have understood the Fourth Amendment is violated when deadly force is used on an unarmed man, who is standing motionless, with his hands raised. Thus, based on clearly established law and the facts presented in this case, there are certainly questions of fact as to what occurred in the moments before Causey shot Hernandez — the most

important of which being where Hernandez's hands were located. *See Amador*, 961 F.3d at 730 (holding that "[e]very reasonable officer would have understood that using deadly force on a man holding a knife, but standing nearly thirty feet from the deputies, motionless, and with his hands in the air for several seconds, would violate the Fourth Amendment.").[7]

Causey argues that his use of force was reasonable because he feared for his life and the lives of his colleagues. [75-1], pg. 41:15-21. The Fifth Circuit has held that "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the force has ceased." *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 413 (5th Cir. 2009). "To say otherwise would grant officers an ongoing license to kill an otherwise unthreatening suspect who was threatening earlier." *Amador*, 961 F.3d at 730 (quoting *Abraham v. Raso*, 183 F.3d 279, 294 (3rd Cir. 1999) (internal quotations omitted)).

In *Lytle v. Bexar County Texas*, the Fifth Circuit found that the officer could have "had sufficient time to perceive that any threat to him had passed by the time he fired[,]" which was "anywhere from three to ten seconds, perhaps even more" after the perceived threat, rather than "in near contemporaneity" with the perceived threat. *Lytle*, 560 F.3d at 414. Here, Causey had approximately eight seconds to evaluate Hernandez standing twelve to fifteen yards away. [75-8] at

---

[7] *Baskin v. Martinez*, 243 N.J. 112 (N.J. S. Ct. 2020) *cert. denied,* 141 S. Ct. 956, 208 L. Ed. 2d 494 (2020) (holding that "the law prohibiting the use of deadly force against a surrendering suspect — one with empty hands in the air and posing no imminent threat — was clearly established); *Hemphill v. Schott*, 141 F.3d 412, 417 (2nd Cir. 1998) (accepting as true the plaintiff's version of facts, the court found that the officer's "alleged decision to use potentially deadly force upon a suspect who stopped and raised his arms in the air when commanded to do so [did] not qualify as reasonable" under the circumstances); *Gray-Hopkins v. Prince George's Cnty., Maryland*, 309 F.3d 224, 227–28 (4th Cir. 2002) (accepting the plaintiff's version of facts, that he had his hands raised over his head at the time he was shot, that he was not resisting arrest or posing a threat to the safety of the other officers, the court denied qualified immunity finding that "a trier of fact could clearly conclude that a Fourth Amendment violation occurred."); *Longoria v. Pinal Cnty.*, 873 F.3d 699, 709–11 (9th Cir. 2017) (reversing grant of qualified immunity because material facts were disputed and because the suspect's "Fourth Amendment right not to be shot dead while unarmed, surrounded by law enforcement, and in the process of surrendering [was] clearly established").

17:06-17:14. In the light most favorable to Hernandez, the Court must accept at this stage that Hernandez had his hands raised and his palms facing Causey before Causey shot him.

While the Court is "loath to second-guess the decisions made by police officers in the field," upon careful consideration of the facts of this case and the factors that should be used in evaluating an officer's use of force, a jury could conclude that a clearly established Fourth Amendment violation occurred. *Winzer*, 916 F.3d at 476. The Court finds that a genuine issue of material fact exists that must be submitted to a jury for resolution. *Amador*, 961 F.3d at 730.

## V. CAUSEY'S MOTION TO STRIKE

Causey filed a Motion to Strike [81] Hernandez's exhibits P-8, P-14, P-15, P-16, P-17, P-18, P-19, P-20, and P-22 offered in support of Hernandez's Response in Opposition to Causey's Motion for Summary Judgment. *See* [75-6; 75-12 through 75-18; 75-20]. Causey argues that these exhibits are not proper summary judgment evidence in qualified immunity cases. However, "objections to evidence on the ground that the evidence is irrelevant, speculative, argumentative, vague and ambiguous, or constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself." *Gaub v. Pro. Hosp. Supply, Inc.*, 845 F. Supp. 2d 1118, 1128 (D. Idaho Jan. 10, 2012) (citing *Burch v. Regents of the University of California*, 433 F. Supp. 2d 1110, 1122 (E.D. Cal. Jun. 5, 2006). Such "[o]bjections or motions to strike on any of these grounds are superfluous, and the court will overrule them." *Gaub*, 845 F. Supp. 2d 1118 Further, the Court only considered P-18 in ruling on the Motion for Summary Judgment. For these reasons, Causey's objections to the other exhibits are moot. Causey may raise these objections at the motion *in limine* stage.

The Court considered P-18, the affidavit of biomechanical expert Ruhi Arslanoglu, in the summary judgment analysis. Therefore, the Court will address Causey's objection to the admissibility of the biomechanical expert's opinions. Hernandez timely designated Mr. Arslanoglu as an expert in

biomedical engineering and biomechanics on September 21, 2020. His affidavit is being offered to determine whether Hernandez's injury is consistent with Hernandez's hands being raised at the time of the shooting. Causey asserts that Mr. Arslanoglu's affidavit is not relevant to the issue of qualified immunity. More specifically, Causey argues that Mr. Arslanoglu's affidavit, is not relevant because (1) it amounts to improper witness vouching, particularly when there is video evidence, and (2) because the affidavit provides impermissible commentary on the credibility of fact witnesses. Causey did not challenge the reliability or qualifications of Mr. Arslanoglu in his Motion to Strike.

Expert testimony is relevant if it will "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ("This condition goes primarily to relevance. 'Expert testimony which does not relate to any issue in the case is not relevant, and ergo, non-helpful.'") (citation omitted). Because Mr. Arslanoglu's affidavit relates to the pivotal issue in this case — where Hernandez's hands were located at the time of the shooting — the Court finds it relevant.

Causey asserts that Mr. Arslanoglu's affidavit is not relevant because it amounts to improper witness vouching when there is video evidence. But it is impossible for the Court to determine where Hernandez's hands were at the time of the shooting from the video footage available. Therefore, the Court finds that Mr. Arslanoglu's affidavit is relevant to the qualified immunity analysis, specifically to the question of where Hernandez's hands were positioned at the time of the shooting. *See Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1175 (10th Cir. 2020) (reversing trial court's grant of summary judgment for qualified immunity as to defendant officer and taking into consideration "plaintiffs' biomechanics expert" that "opined Mr. Smart's bullet wounds could not have been inflicted while he was hunched forward as Officers Froese and Chaffee described Mr. Smart's posture when fleeing.").

21

Causey also argues that Mr. Arslanoglu's affidavit is inadmissible because, within it, he provides impermissible commentary on the credibility of fact witnesses. [87], pg. 8. It is well established that credibility determinations and decisions as to the weight given to factual testimony are the province of the jury. *See Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 480 (5th Cir. 2007). And expert witnesses are not permitted to provide commentary on the credibility of fact witnesses. *Westcott v. Crinklaw*, 68 F.3d 1073, 1076 (8th Cir. 1995) (holding that an expert may not usurp the exclusive function of the jury in weighing evidence and determining credibility, or pass judgment on the truthfulness of a witness in the guise of professional opinion). At the hearing on this Motion, Causey relied on *Albert v. City of Petal*, 819 F. App'x 200 (5th Cir. 2020) (affirming *Albert v. City of Petal*, No. 2:18-cv-96-KS, 2019 WL 10736149 (S.D. Miss. Sep. 30, 2019), in support of his argument to strike Mr. Arslanoglu's affidavit. In *Albert*, the Fifth Circuit affirmed the exclusion of plaintiff's forensic pathology expert as inadmissible. Upon review of the expert's opinions offered in *Albert*, the Court finds that the opinions offered by Mr. Arslanoglu are distinguishable from those offered in *Albert*.

First, the expert in *Albert* offered opinions concerning the use of restraint on the decedent — specifically opining that the decedent "could have been completely restrained and immobilized by Officer Jernigan and other officers who arrived to the scene[.]" *Albert v. City of Petal*, No. 2:18-cv-96-KS, 2019 WL 10736149, at *8 (S.D. Miss. Sep. 30, 2019). The defendant argued that the expert was not *qualified* to provide expert testimony regarding police restraint procedures, and the court agreed. The court excluded any proposed testimony regarding the restraint and immobilization of the decedent. *Albert*, 2019 WL 10736149, at *9. Here, however, Causey does not challenge the qualifications of Mr. Arslanoglu to provide opinions on biomechanics or biomedical engineering, and Mr. Arslanoglu does not provide opinions as to police procedure.

22

Second, while the defendant in *Albert* did argue that the expert's opinion should be excluded because it provided improper commentary on the credibility of witnesses, that too is distinguishable from Mr. Arslanoglu's opinions. The expert in *Albert* offered the following opinion: "[t]he statements of Bryan Lee and Officer Jernigan are markedly different in their descriptions of the incident." *Id*. The court determined that the expert provided impermissible commentary on the credibility of fact witnesses and excluded the expert's statement. Although Causey failed to point to a specific statement to which he objects, Mr. Arslanoglu offered the following opinions in his affidavit:

> When Hernandez' right forearm was struck with the bullet, his right hand was not on or near his waist or reaching into his right side pocket as claimed by Causey. Hernandez' diagnosed proximal radius injury and point of entry are consistent with his right forearm positioned forward of his body. Causey's testimony is inconsistent with Hernandez' diagnosed injury. Hernandez' testimony is not inconsistent with his diagnosed injury.

The first two sentences of Mr. Arslanoglu's affidavit are clearly distinguishable from the expert's opinion in *Albert* and do not provide impermissible commentary on the credibility of fact witnesses. The last two sentences of Mr. Arslanoglu's affidavit are also distinguishable as they do not tend to pass judgment on Causey's truthfulness under the guise of Mr. Arslanoglu's professional opinion. Such testimony is permissible summary judgment evidence. *Est. of Smart by Smart*, 951 F.3d at 1175. Indeed, Causey does not dispute Mr. Arslangolu's qualifications to testify in the field of biomedical engineering or biomechanics. Nor does Causey dispute the reliability of those opinions. Causey presents no authority that prohibits an expert from testifying that the science of a particular field contradicts a different version of events.

For the reasons discussed above, Causey's Motion to Strike exhibits P-8, P-14, P-15, P-16, P-17, P-19, P-20, and P-22 is denied as moot. Causey may raise these objections at the appropriate stage of this litigation. Causey's Motion to Strike P-18 is denied.

## VI. CONCLUSION

For the reasons stated above, **IT IS THEREFORE ORDERED AND ADJUDGED** that United States' Motion to Dismiss [68] the negligent training and supervision claim is GRANTED. Hernandez's negligent training and supervision claim is dismissed without prejudice.

**IT IS FURTHER ORDERED AND ADJUDGED** that Phillip Causey's Motion for Summary Judgment [68] on the basis of qualified immunity is DENIED.

**IT IS FURTHER ORDERED AND ADJUDGED** that Phillip Causey's Motion to Strike [81] is denied with respect to P-18 and moot in all other respects.

**THIS, THE 4th DAY OF MAY, 2021.**

TAYLOR B. McNEEL
UNITED STATES DISTRICT JUDGE